Shawn Mendel
550 SE 6th Street
Hialeah, FL 33010
Ph. 305-360-6216
Email: Carpartners1@gmail.com

FILED BY MP D.C.
NOV 04 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT
S. D. OF FLA. - MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

SHAWN MENDEL,
Plaintiff, Pro Se,

vs.

THE SECRETARY OF THE UNITED STATES DEPARTMENT OF TRANSPORTATION, in his official capacity;

JAMES UTHMEIER, in his individual and official capacity as Attorney General of the State of Florida;
DAVE KERNER, in his individual and official capacity as Executive Director of the Florida Department of Highway Safety and Motor Vehicles;

MIAMI-DADE COUNTY, a political subdivision of the State of Florida as operator of Miami International Airport;

UBER TECHNOLOGIES, INC., a Delaware Corporation; and
RASIER, LLC, a Delaware Limited Liability Company,
Defendants.

Case No.: ______________________

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Shawn Mendel, appearing pro se and proceeding in forma pauperis, files this Verified Complaint against the above-named Defendants, invoking the private enforcement mechanisms established by Congress under 49 U.S.C. Section 14704(b) and Section 14707, the Administrative Procedure Act under 5 U.S.C. Section 706, civil rights protections under 42 U.S.C. Section 1983, and the United States Constitution, to halt ongoing, unregistered commercial passenger motor carrier and broker operations within this judicial district.

## I. INTRODUCTION

1 Plaintiff Shawn Mendel brings this action to challenge the legality, constitutionality, and operational validity of Florida Statute Section 627.748 (the "Florida TNC Act").

2 Plaintiff challenges the unregistered, non-federally compliant commercial operations of Defendant UBER TECHNOLOGIES, INC. ("UBER") and its alter ego RASIER, LLC within the channels of interstate commerce.

3 Plaintiff challenges the state-shielded regulatory vacuum that immunizes these entities from standard anti-fraud, transparency, and federal financial responsibility tracking.

4 Plaintiff seeks a binding judicial declaration that the Florida TNC Act is void under the Supremacy Clause because it explicitly immunizes an industrialized commercial transport system from mandatory federal broker and motor carrier registration, insurance floors, safety compliance audits, and public oversight.

5 Plaintiff seeks an injunction under 49 U.S.C. Section 14707 halting Defendant UBER's unauthorized operations at Miami International Airport ("MIA") and within the Southern District of Florida.

6 Plaintiff concurrently seeks an order striking down the predatory, localized airport access fees enforced by Defendant MIAMI-DADE COUNTY.

7 The statutory artifice deployed by Defendant UBER—separating its digital matching software from the physical carriage of passengers—is not a modern innovation.

8 In mid-20th-century commerce, identical matching entities were known as "travel bureaus".

9 In *Interstate Commerce Commission v. AAA Con Drivers Exchange, Inc*., 340 F.2d 820 (2d Cir. 1965), the federal judiciary pierced this exact subterfuge.

10 The court ruled that intermediaries determining the terms of the relationship, establishing pricing, vetting participants, and orchestrating the commercial infrastructure are, as a matter of economic and legal reality, motor carriers providing transportation for compensation subject to full federal licensing mandates.

11 Following the Supreme Court's landmark ruling in ***Loper Bright Enterprises v. Raimondo***, 144 S. Ct. 2244 (2024), this Court must engage in a de novo textual analysis of federal transportation exemptions.

12 Under 49 U.S.C. Section 13506(a)(2), Congress explicitly stripped casual vehicle exemptions away from any entity matching passengers whenever a "broker or other person" sells or offers passenger transportation as a regular occupation or business.

13 Operating an apparatus executing millions of daily trips, Defendant UBER triggers this exception, bringing its entire network under the mandatory authority of 49 C.F.R. Section 372.101.

14 Consequently, Defendant UBER's entire operations are subject to the strict federal motor carrier safety management frameworks of 49 C.F.R. Part 390 and financial responsibility mandates of 49 C.F.R. Part 387.

**II. JURISDICTION AND VENUE**

15 This Court possesses subject-matter jurisdiction pursuant to 28 U.S.C. Section 1331 (federal question), 28 U.S.C. Section 1343 (civil rights enforcement), and 42 U.S.C. Section 1983.

16 This Court possesses original mandamus jurisdiction over federal officials pursuant to 28 U.S.C. Section 1361.

17 Plaintiff asserts a deprivation of federal statutory rights secured by the laws and Constitution of the United States under color of State and Federal law.

18 Specifically, the alternative regulatory framework enforced by the State Defendants deprives Plaintiff of federal statutory rights secured by Title 49.

19 This framework denies Plaintiff the right to compete in a federally normalized interstate market free from diluted state safe-havens.

20 This Court possesses explicit statutory jurisdiction under 49 U.S.C. Section 14704(b) and Section 14707(a).

21 These statutes arm private injured parties with a direct right of action to bring a civil suit in federal district court to enjoin motor vehicle transportation operating in clear violation of federal registration mandates (49 U.S.C. Sections 13901-13904).

22 In strict compliance with 49 U.S.C. Section 14707(b), a true and accurate copy of this Complaint has been formally served upon the Secretary of the United States Department of Transportation.

23 Venue is proper in the Southern District of Florida under 28 U.S.C. Section 1391(b) because a substantial part of the events, systematic statutory violations, and direct economic injuries giving rise to these claims occur within Miami-Dade County.

24 These systematic violations directly impact the arteries of interstate commerce at Miami International Airport.

25 Plaintiff, appearing pro se, explicitly invokes the protective pleading standards established by the United States Supreme Court in ***Haines v. Kerner***, 404 U.S. 519 (1972) and ***Erickson v. Pardus***, 551 U.S. 89 (2007).

26 Under this long-standing federal doctrine, a pro se litigant's pleadings must be held to less stringent standards than formal pleadings drafted by members of the bar, and must be liberally construed by this Court in favor of the plaintiff.

27 Concurrently, under the Eleventh Circuit's binding rule in *Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008), this Court holds an independent, non-delegable duty to look past any technical formatting imperfections.

28 The Court holds a duty to examine the substantive core of Plaintiff's allegations and to actively protect a pro se litigant's right of access to the federal judiciary where severe constitutional and federal statutory deprivations are clearly alleged.

29 **INDEPENDENCE OF ACTION**. Pursuant to Local Rule 3.8 of the Southern District of Florida, Plaintiff notes that while this Complaint references broader nationwide operational data and consolidated multidistrict litigation profiles for contextual notice and corporate notice verification, this action presents entirely distinct, localized federal statutory enforcement claims under 49 U.S.C. Section 14704, Section 14707 and civil rights claims under 42 U.S.C. Section 1983.

30 These claims arise from unique, post-2024 economic and physical metrics within the Southern District of Florida.

31 Accordingly, this matter is completely independent and does not qualify for consolidation or transfer to any alternative active docket {see Notice of Non-Relatedness filed herewith}.

**THE MANDATE FOR DE NOVO TEXTUAL ANALYSIS UNDER LOPER BRIGHT**

32 Following the United States Supreme Court's landmark ruling ***in Loper Bright Enterprises v. Raimondo***, 144 S. Ct. 2244 (2024), this Court owes no deference to administrative or historical judicially-created expansions, contractions, deletions, or policy-driven distortions of federal transportation statutes.

33 This Court holds a non-delegable duty to execute a de novo textual analysis of the plain language enacted by Congress under Title 49.

34 Congress explicitly chose to define "motor carriers" under 49 U.S.C. Section 13102(14) and "brokers" under 49 U.S.C. Section 13102(2) strictly by their functional market conduct and economic reality.

35 Congress completely omitted any statutory prerequisite concerning physical vehicle ownership, formal equipment leasing, or rental agreements.

36 Prior lower court departures unconstitutionally injected an un-enacted vehicle-ownership requirement into Chapter 139, effectively deleting the mandatory passenger broker registration requirements of 49 U.S.C. Sections 13904(d) and 13904(f).

37 Under ***Loper Bright***, this Court must reject those judicial modifications, adhere strictly to the plain text enacted by Congress, and evaluate Defendant UBER's liability solely based on its systematic, daily conduct in arranging and providing interstate passenger transportation for compensation.

## III. THE PARTIES AND PLAINTIFF'S CONCRETE INJURY-IN-FACT

38 Plaintiff, SHAWN MENDEL, is a 30-year veteran black car driver and a former commercial fleet operator who successfully managed an independent executive livery business consisting of 33 vehicles under comprehensive federal, state, and local regulatory oversight.

39 Plaintiff's residence and office is located at 550 SE 6th Street, Hialeah, FL 33010.

40 Plaintiff's intermittent use of Defendant Uber's app testing regional profitability has conclusively proven that Defendant has crushed the traditional marketplace so severely that Plaintiff is forced to exercise his express private right of enforcement under federal law (see Exhibit A).

41 Plaintiff exercises this right particularly where the Federal Motor Carrier Safety Administration (FMCSA) systematically avoids executing its mandatory enforcement protocols under 49 U.S.C. § 14916.

**41(a).** This administrative avoidance constitutes a total, formalized abdication of enforcement power by the executive branch. As formally documented in the **FMCSA's July 2024 Unlawful Brokerage Activities Report to Congress**, following the landmark 2019 administrative law decision ***In re Darlene Riojas*, FMCSA Case No. 2012-0174**, the agency completely lacks the statutory authority to internally assess, judge, or enforce civil penalties against unauthorized brokers under 49 U.S.C. § 14916.

**41(b).** Because the FMCSA's formal report to Congress admits a total enforcement flatline of **absolute zero** civil penalty collections or active regulatory tracking mechanisms within the passenger brokerage sector, the agency is structurally paralyzed. Consequently, Plaintiff's private right of action under 49 U.S.C. § 14707(a) is not merely a parallel alternative; it stands as the **sole remaining operational vehicle** enacted by Congress to enforce registration parameters and restore law and order within the national stream of commerce.

42 Plaintiff currently operates as a driver utilizing Defendant's application software within the continuous channels of interstate commerce, and frequently utilizes rideshare services as an interstate prearranged passenger.

43 Plaintiff has suffered severe, concrete economic injury-in-fact and direct financial liability exposure, caused by the unconstitutional, distorted dual-regulatory market engineered by the Florida TNC Act and exploited by Defendant UBER.

44 Plaintiff is a lawfully credentialed commercial livery operator holding a license issued explicitly pursuant to Section 31-613 of the Miami-Dade County Code.

45 By virtue of holding this municipal credential under Chapter 31, Article VI, Plaintiff is legally bound to absorb severe regulatory compliance overhead, extensive background checks, strict vehicle age restrictions, and mandatory commercial livery insurance floors.

46 Plaintiff stands ready, willing, and able to immediately scale and operate his independent executive car service within the regional South Florida market.

47 However, Plaintiff faces an insuperable and direct competitive injury-in-fact because Defendant UBER uses an unpermitted, non-compliant fleet to completely bypass the costly federal safety management protocols of 49 C.F.R. Part 390 and financial responsibility limits of 49 C.F.R. Part 387.

48 This evasion artificially suppresses marketplace pricing and inflicts direct competitive exclusion against licensed § 31-613 operators.

49 By evading these federal costs, Defendant UBER leverages an artificial marketplace advantage to suppress consumer pricing below actual commercial operating costs, effectively excluding compliant operators from viable market entry.

50 Plaintiff's statutory standing to bring this private enforcement action is explicitly anchored to the plain text of 49 U.S.C. Section 14704(b) and Section 14707(a), which provides that a person injured by transportation or service provided in violation of federal registration requirements may sue for an injunction and damages in federal district court.

51 A traditional commercial transport provider suffers a concrete, legally cognizable competitive injury under Section 14704(b) and Section 14707(a) when an unregistered competitor leverages

its non-compliance with federal motor carrier law to bypass regulatory overhead, forcing lower predatory pricing that inflicts severe, direct competitive harm on compliant market entrants.

52 The requirement for federal jurisdiction is met here because Defendants UBER and RASIER operate an industrialized commercial passenger carriage network without holding any active operational authority from the Federal Motor Carrier Safety Administration (FMCSA) (see Exhibit E).

53 Because Defendant UBER exercises exclusive operational control over passenger allocations, vehicle specifications, and non-negotiable pricing corridors, it cannot hide behind its digital nomenclature to escape the regulatory definitions of a carrier or broker under *ICC v. Mr. B's Services, Ltd.*, 934 F.2d 117 (7th Cir. 1991).

54 To establish standing to survive a motion to dismiss, Plaintiff explicitly hooks his injury-in-fact to concrete baseline metrics, contrasting the Internal Revenue Service (IRS) standard mileage cost floors against Defendant UBER's operational payouts.

55 For the relevant operating period, the IRS standard cost floor stands at $0.725 per mile.

56 In stark contrast, Defendant UBER operates at an algorithmic baseline payout of approximately $0.61 per mile within this jurisdiction, shifting 100% of equipment and compliance overhead onto the driver.

57 This delta constitutes an engineered market exclusion and predatory extraction rather than lawful, fair market competition.

58 As a direct result of this state-shielded, predatory mechanism, during a recent week of operation, Plaintiff was forced to labor online for 55 hours, grossing $465.00.

59 After deducting mandatory commercial expenses directly forced by market parameters—including $330.00 for a vehicle rental, $80.00 for charging, and $18.00 in tolls—Plaintiff was left with a mathematically absurd net profit of just $37.00 for 55 hours of commercial labor, triggering immediate operational insolvency against fixed income (see Exhibit A).

60 But for the unlawful regulatory safe-havens created by Fla. Stat. Section 627.748 and the unpermitted, non-compliant operations of UBER, Plaintiff would operate a sustainable, independent, federally-compliant livery service free from predatory market distortion.

61 Defendant THE SECRETARY OF THE UNITED STATES DEPARTMENT OF TRANSPORTATION is sued in his official capacity as the chief executive officer of the federal department legally mandated under Title 49 of the United States Code to administer and enforce national commercial transportation registration and safety boundaries.

62 By virtue of his office, the Secretary holds a specific, non-discretionary statutory command under 49 U.S.C. Section 13901(a) to ensure that no passenger brokerage operations clear national arteries without active registration.

63 The Secretary holds a concurrent ministerial command under 49 U.S.C. Section 13904(d) to establish and maintain an active passenger broker registration index within the Unified Registration System.

64 The Secretary is the specific federal official to whom a Writ of Mandamus must be directed under 28 U.S.C. Section 1361 to compel compliance with these explicit congressional acts.

65 Defendant JAMES UTHMEIER is the Attorney General of the State of Florida and is sued in his individual and official capacity.

66 Under Florida law, the Attorney General is the chief legal officer of the State and is explicitly charged under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) and state anti-fraud statutes with the public duty to protect the commercial marketplace from structural fraud and unconscionable business practices.

67 Under the *Ex parte Young* doctrine, Defendant Uthmeier is a proper party because he is the chief legal official tasked with the state-wide defense, validation, and ultimate statutory enforcement of Fla. Stat. Section 627.748.

68 By actively defending and maintaining this unconstitutional statutory framework under color of state law, Defendant Uthmeier enforces an alternative, diluted state-level sanctuary that actively immunizes Defendant UBER from standard state-level fraud, transparency, and anti-scam oversight.

69 This state-shielded regulatory vacuum prevents normal law enforcement mechanisms from reaching or halting the predatory infrastructure that proximately causes Plaintiff's market exclusion, financial exposure, and competitive injury.

70 Defendant DAVE KERNER is the Executive Director of the Florida Department of Highway Safety and Motor Vehicles (FLHSMV) and is sued in his individual and official capacity.

71 Defendant Kerner possesses a direct, field-level enforcement connection to the challenged framework because the FLHSMV is the specific state administrative agency legally tasked with executing, regulating, and policing motor vehicle registration, highway safety, financial responsibility compliance, and driver licensing systems across Florida.

72 By actively instructing state highway patrol officers and field-level enforcement personnel to recognize the unconstitutional exemptions carved out by Fla. Stat. Section 627.748, Defendant Kerner directly administers the dual-regulatory safe-haven that floods the market with non-federally compliant vehicles.

73 This administrative shielding constitutes the proximate cause of Plaintiff's injury-in-fact because but for the FLHSMV's continuous state-level authorization of these non-compliant vehicles, Defendant UBER would be legally barred from operating its unpermitted network, thereby restoring a federally normalized, non-predatory livery market.

74 Defendant MIAMI-DADE COUNTY is a political subdivision of the State of Florida.

75 Through its Aviation Department, Miami-Dade County owns and operates Miami International Airport, and actively enforces per-trip TNC fee assessments and forced terminal contract frameworks.

76 These airport regulations directly penalize compliant prearranged passenger carriers while acting as an unconstitutional pay-to-play system for unpermitted platforms.

77 Defendant UBER TECHNOLOGIES, INC. is a multi-billion-dollar Delaware corporation with its principal place of business in San Francisco, California (see Exhibit C).

78 UBER actively coordinates, manages, controls, and dispatches an industrialized commercial passenger transportation network executing millions of daily trips across state lines and international transit hubs within this judicial district.

79 Defendant UBER operates this network without holding any active motor carrier or broker authority from the Federal Motor Carrier Safety Administration (FMCSA) (see Exhibit C).

80 Defendant RASIER, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California, and is a wholly owned subsidiary of Defendant UBER TECHNOLOGIES, INC.

81 Defendant RASIER, LLC is the primary operational entity through which UBER executes its commercial rideshare operations, enters into adhesive driver agreements, and holds local operating permissions within the State of Florida.

82 At all times relevant, Defendant RASIER, LLC has acted as the direct agent, instrumentality, and alter ego of Defendant UBER TECHNOLOGIES, INC.

83 Any acts, omissions, or statutory violations committed by Rasier are legally attributable to Uber, and vice versa.

84 Defendants UBER and RASIER are collectively referred to herein as "Defendant UBER".

## IV. GENERAL ALLEGATIONS

### A. The Continuous Interstate Journey Doctrine and the "Fixed and Persisting Intent" Framework

85 Defendant UBER routinely seeks to escape federal oversight by falsely characterizing its digital application as an isolated, localized municipal utility.

86 However, under long-standing federal transportation jurisprudence, the geographic boundaries where a vehicle's tires roll do not dictate the character of commerce.

87 Under the supreme federal "Fixed and Persisting Intent" Doctrine established by the United States Supreme Court in ***Baltimore & Ohio S.W.R. Co. v. Settle***, 260 U.S. 166 (1922), the legal nature of an entire passenger transit route is determined exclusively by the unbroken operational intent of the traveler at the time of booking.

88 Furthermore, Defendant UBER cannot seek safe-harbor under the statutory "taxicab service" exemption of 49 U.S.C. Section 13506(a)(2) by mischaracterizing its operation as a purely local municipal utility.

89 The geographic scope and systematic distance parameters of an entity's trips dictate whether an operation remains local or crosses into federal jurisdiction.

90 As explicitly articulated by the United States Court of Appeals for the Seventh Circuit in *Interstate Commerce Commission v. Mr. B's Services, Ltd.*, 934 F.2d 117, 122 (7th Cir. 1991), the federal taxicab exemption is strictly confined to operations that are "inherently local" in nature.

91 The moment commercial transportation ceases to be local—either because the physical trip distance extends past standard municipal boundaries or because the platform holds itself out to systematically interface with continuous interstate transit pipelines—the municipal exemption is stripped away as a matter of law.

92 Because Plaintiff's contemporaneous digital business records verify that Defendant UBER routinely dispatched him to execute regional, long-distance interstate corridors exceeding 100 to 270 miles, Defendant UBER's operations transcend any "inherently local" classification (see Exhibit A).

93 These long-distance routes include prearranged corporate runs spanning from Miami to Naples and Tampa, thereby bringing its network under the mandatory jurisdiction of the FMCSA.

94 When an out-of-state or international passenger books commercial passage via a commercial airline to Miami International Airport (MIA), with a prearranged destination to a regional transit

node, local hotel, or international maritime interface (such as PortMiami), the ground transportation leg constitutes an inseparable, continuous link in an unbroken chain of interstate and foreign commerce.

95 As affirmed by the United States Court of Appeals for the Eleventh Circuit in *Executive Town & Country Service, Inc. v. City of Atlanta,* 789 F.2d 1523 (11th Cir. 1986) and the Fifth Circuit in *Charter Limousine, Inc. v. Dade County*, 678 F.2d 586 (5th Cir. 1982), prearranged airport hub transfers capturing out-of-state travelers operate squarely within the exclusive regulatory domain of federal motor carrier law, rendering any conflicting state-level local exemptions completely void.

96 Concurrently, Defendant UBER cannot seek refuge under any de minimis exception by claiming that its regional, cross-county, and airport-hub dispatches constitute a minor percentage of its total domestic ride volume.

97 Under long-standing federal transportation jurisprudence established by the United States Supreme Court in ***Morris v. McComb***, 332 U.S. 422 (1947), the regulatory jurisdiction over a carrier is triggered whenever interstate routes form a "natural, integral, and apparently inseparable part" of the regular course of business.

98 This jurisdiction remains absolute even if those routes constitute a nominal fraction of total fleet activity.

99 As explicitly codified within this judicial circuit in *Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221 (11th Cir. 2009), a carrier's interstate transportation parameters transcend de minimis classifications **if they represent 1% or more of overall operational**

**outputs**, or where undisputed proof demonstrates systematic linkage to an interstate infrastructure corridor.

100 Because Defendant UBER maintains an industrialized algorithmic matching platform executing millions of daily trips that systematically and continuously captures out-of-state passengers arriving at Miami International Airport (MIA), its interstate commercial brokerage parameters are absolute and legally significant, mandating absolute compliance with Title 49 registration codes.

101 Plaintiff's standing as an injured competitor directly operating within this specific interstate corridor is verified by contemporaneous digital trip documentation.

102 Plaintiff has personally executed numerous regional, long-distance prearranged transit routes via the Defendant UBER's platform that directly transcend municipal boundaries and casual local transit zones.

103 Specifically, Plaintiff has completed commercial transport routes originating within Miami-Dade County and terminating in Naples, Florida (a continuous transit route of approximately 110 miles traversing Federal-state-regulated highways).

104 Plaintiff has similarly executed commercial transport routes from the Miami metropolitan area to Tampa, Florida (exceeding a 270-mile operational radius).

105 Furthermore, Plaintiff's business records verify that he routinely accepts and executes prearranged airport-hub dispatches capturing out-of-state and international travelers arriving at Miami International Airport (MIA).

106 These dispatches require physically transferring those travelers along an unbroken, prearranged stream of commerce to international cruise terminals at PortMiami.

107 Because the underlying travelers' fixed and persisting intent was an unbroken leg of national and foreign commerce, Defendant UBER's systematic arrangement, pricing, and dispatching of these trips constitute the unauthorized, unregistered brokering of interstate motor carrier transit in patent violation of 49 U.S.C. Sections 13901-13904 (see Exhibit E).

**B. Algorithmic Overhead Evasion and the Engineering of Market Exclusion**

108 Defendant UBER's systematic defiance of federal motor carrier registration rules has engineered an economic crisis for fully compliant, traditional transportation operators.

109 By operating outside the mandatory authority of the Federal Motor Carrier Safety Administration (FMCSA), Defendant UBER avoids the substantial administrative and financial overhead required to maintain a federally standardized interstate commercial network.

110 Traditional, compliant executive livery operators must absorb significant structural expenses, including mandatory commercial-grade public liability insurance.

111 Compliant operators must also pay for formal vehicle safety inspection regimes, commercial vehicle registration plating, and continuous driver qualification maintenance under 49 U.S.C. 14501(d) and 49 C.F.R. Part 390.

112 In stark contrast, the state-shielded regulatory safe-haven engineered by Florida Statute Section 627.748 allows Defendant UBER to externalize 100% of physical equipment, vehicle maintenance, and localized operating costs directly onto individual app drivers.

113 By permitting a multi-billion-dollar network to match passengers using unregistered, non-commercially plated personal vehicles, the State of Florida actively immunizes these platforms from standard oversight, allowing them to bypass the costly regulatory baseline mandated for interstate transport providers.

114 This systematic evasion creates a severe, artificial marketplace distortion.

115 Because Defendant UBER is permitted to bypass the financial compliance floor commanded by Congress under Title 49, it algorithmically enforces a predatory payout structure—averaging $0.51 to $0.61 per mile within this jurisdiction—which falls far below the Internal Revenue Service (IRS) standard operating cost floor of $0.725 per mile.

116 This pricing delta does not represent fair market competition; it represents an engineered barrier to entry.

117 A fully compliant carrier cannot compete in a market where the dominant platform uses a state-level regulatory sanctuary to evade federal registration costs and suppress consumer pricing below actual commercial operating cost floors.

118 But for the unconstitutional alternative framework enforced by the State Defendants, Defendant UBER would be legally required to either cease its interstate brokerage operations or compel its network into absolute compliance with FMCSA safety management protocols, thereby restoring a normalized, non-predatory livery market.

**C. Systematic Evasion of Vehicle Safety Regulations Under 49 C.F.R. Part 390**

119 Under long-standing federal motor carrier regulations, an authorized commercial transport enterprise utilizing equipment it does not directly own must comply fully with the comprehensive safety management system requirements of 49 C.F.R. Part 390.

120 This mandates that the carrier assume absolute operational safety responsibility for the vehicles, enforce strict vehicle maintenance controls, maintain driver qualification files, and submit to mandatory federal safety management audits.

121 Defendant UBER utilizes thousands of private vehicles within its network while systematically failing to establish these mandated safety management frameworks or assuming corporate operational safety responsibility, in direct violation of Part 390.

122 Instead, UBER relies on Fla. Stat. Section 627.748(18) to claim absolute immunity from common-law carrier liability.

123 By using state legislation to strip away carrier operational responsibility, the state enables UBER to access interstate markets while completely evading federal financial responsibility, public liability tracking, and safety audit requirements.

124 Under 49 U.S.C. Section 14501(d)(1) (The Real Interstate Driver Equity Act), Congress explicitly stripped political subdivisions and municipal airport authorities of the power to levy any localized tax, fee, or per-trip surcharge on account of the fact that a motor vehicle is providing prearranged ground transportation.

125 Only Congress possesses the authority to tax the instruments of interstate commerce.

126 Conversely, under Section 14501(d)(3)(B), airport providers may only enter into voluntary contracts for preferential curb access for non-prearranged transit of the airport's customers.

127 Defendant MIAMI-DADE COUNTY has inverted this rule at Miami International Airport by enforcing forced contractual schemes and assessing mandatory per-trip TNC fees, generating millions of dollars via an illegal tax on interstate prearranged passenger transit.

128 Aviation enforcement officials actively stopped impounding non-compliant, un-commercial-plated rideshare vehicles only when UBER capitulated to these local fee demands.

129 This pay-to-play compromise unconstitutionally penalizes compliant, traditional prearranged providers whose access to MIA must remain free of localized fees or forced contracts under federal law.

**E. Defendant Uber's Unclean Hands and Systemic Regulatory Evasion**

130 Plaintiff invokes the equitable doctrine of Unclean Hands against Defendant UBER.

131 A defendant cannot seek equitable shields, assert market fairness defenses, or claim hardship when its own corporate operations are built upon a systematic, bad-faith evasion of mandatory federal public safety, registration, and vehicle safety disclosures under 49 C.F.R. Part 390.

132 Defendant UBER comes before this Court with profoundly unclean hands.

133 UBER actively coordinates and profit-extracts from a massive network executing millions of daily trips nationally while completely bypassing the mandatory State-supervised registration, insurance, and safety management frameworks commanded by Congress.

134 Defendant UBER cannot use the legal system to dismiss an injured competitor's claims when its own market dominance is achieved exclusively through the continuous, unlawful and unregistered exploitation of non-federally compliant transit operations.

**F. Corporate Unity and Alter Ego Liability of Uber and Rasier**

135 Plaintiff alleges that there exists a complete unity of interest, ownership, and operational control between Defendant UBER TECHNOLOGIES, INC. and its wholly owned subsidiary, Defendant RASIER, LLC.

136 RASIER, LLC functions purely as a shell entity and marketing conduit deployed by UBER TECHNOLOGIES, INC. for the express purpose of shield-insulating the parent corporation from common-law carrier liability, minimum wage compliance, and federal motor carrier registration oversight.

137 Defendant UBER TECHNOLOGIES, INC. exercises total, pervasive dominance over RASIER, LLC, including controlling its financial parameters, dictating its algorithmic surge-pricing structures, managing its digital platform infrastructure, and orchestrating its national legal strategy.

138 Adhering to any corporate separation between these two entities would promote an injustice and permit Defendant UBER to evade mandatory compliance with 49 U.S.C. Sections 13901-13904 and 49 C.F.R. Part 390 through the artifice of deliberate corporate fragmentation.

139 Accordingly, both entities are jointly and severally liable for the systemic federal statutory violations detailed in this Complaint.

**G. Rejection of Uber's "Lack of Worksite Control" Defenses**

140 Defendant UBER routinely seeks to escape structural marketplace accountability by asserting that because it does not own the physical vehicle cabins utilized on its application, it lacks "worksite control" over a fluid moving environment.

This defense is an absolute legal fiction that has been thoroughly rejected by modern federal appellate analysis.

141 As established by the United States Court of Appeals for the Ninth Circuit, Defendant UBER maintains absolute, exclusive control over the digital matching process and the informational parameters of the relationship between driver and customer.

142 Defendant UBER alone dictates the parameters of the digital transportation ecosystem, determines what screening protocols are executed, and controls what pricing data is revealed or withheld.

143 Accordingly, the "worksite" at issue is not merely the physical seat of a motor vehicle; the worksite is the algorithmically enforced dispatch corridor controlled exclusively by Defendant UBER's digital infrastructure.

144 Because drivers are contractually and technologically prohibited from street-hailing and are entirely dependent on UBER's platform to capture prearranged passenger transits, Defendant UBER holds an absolute, non-delegable operational duty to ensure that its pairing mechanics comply fully with the mandatory statutory baselines of the United States.

**H. Intentional Commercial Penetration and Notice of the Regulatory Void**

145 Despite explicit notice of its non-federally compliant status, Defendant UBER has deliberately chosen to maintain its unauthorized passenger brokerage infrastructure within the Southern District of Florida to protect its proprietary revenue channels.

146 Defendant UBER continues to actively process prearranged passenger dispatches that directly interface with continuous pipelines of interstate commerce without holding active operating authority from the FMCSA (see Exhibit E).

147 Because Defendant UBER has full knowledge of this regulatory evasion and possesses the exclusive technical infrastructure to enforce compliance, its ongoing deployment of an unpermitted network constitutes an intentional, bad-faith distortion of the regional transportation market.

**I. Corporate Sophistication Verified by the FMCSA SAFER Database**

148 Plaintiff factually establishes that Defendant UBER's failure to secure federal motor carrier and brokerage operating authority is not the result of administrative oversight, regulatory ambiguity, or corporate ignorance.

149 An audit of the official United States Department of Transportation (USDOT) and Federal Motor Carrier Safety Administration (FMCSA) SAFER database reveals that Defendant UBER maintains full, sophisticated operational knowledge of Title 49 registration mandates

(see Exhibit C).

150 Specifically, Defendant's specialized cargo logistics subsidiary, UBER FREIGHT LLC (USDOT No. 2926893), maintains active, compliant, and continuously monitored operating authority to transport and broker commercial property across state lines using a phone application (see Exhibit C).

151 Consequently, Defendant UBER possesses highly advanced corporate infrastructure and specialized compliance counsel dedicated to executing federal transportation mandates (see Exhibit C).

152 Yet, Defendant deliberately chooses to segment its compliance—honoring the law for property haulage under subsection (a) while intentionally maintaining an unlawful unregistered regulatory void for passenger transit under subsection (d) (see Exhibit E).

153 By deploying an unpermitted passenger matching application backed by zero FMCSA operating authority while simultaneously demonstrating the capacity to hold federal authority for cargo, Defendant UBER establishes bad-faith institutional intent.

154 Defendant utilizes custom state loops like the Florida TNC Act to purposefully evade federal safety management audits, financial liability protocols, and the mandatory safety management controls of 49 C.F.R. Part 390.

**J. Express Admissions in Uber's Institutional Manifesto**

155 Plaintiff factually establishes that Defendant UBER's deployment of an unregistered, non-federally compliant passenger carriage and brokerage infrastructure was an intentional, bad-faith corporate pivot designed to exploit regulatory non-enforcement.

156 On April 12, 2013, Defendant's then-Chief Executive Officer published an official corporate manifesto titled *"Uber Policy White Paper 1.0: Principled Innovation: Addressing the Regulatory Ambiguity Around Ridesharing Apps"* (see Exhibit D).

157 In this official policy document, Defendant UBER explicitly characterized its primary market competitors as entities operating unlawfully by "working exclusively with unlicensed, non-commercially insured vehicles and drivers" (see Exhibit D).

158 The 2013 White Paper contains an express, binding admission of corporate intent, stating that because local regulators chose not to aggressively enforce licensing rules against these non-compliant providers, a climate of "regulatory ambiguity" and "one-sided competition" was created (see Exhibit D).

159 To avoid a commercial disadvantage, Defendant UBER explicitly announced a corporate policy to intentionally launch its own peer-to-peer transit network utilizing unlicensed, non-commercially insured vehicles in any municipal market where regulators exhibited a pattern of non-enforcement or tacit approval for a period of 30 days.

160 This document serves as conclusive, institutional proof of Defendant UBER's unclean hands and bad-faith intent.

161 Defendant possessed absolute knowledge that the underlying transportation model was completely unlicensed and non-compliant with standard commercial safety regulations.

162 Yet, Defendant willfully chose to abandon its compliant black-car infrastructure and systematically deploy a matching platform that mimics an identical, unlawful framework.

163 By its own written admissions, Defendant UBER’s entry into peer-to-peer transit was not a technological accident, but a deliberate, coordinated strategy to bypass mandatory federal transportation registration codes to capture absolute dominance in the national stream of commerce.

**K. Evasion of Mandatory Federal Financial Responsibility Mandates**

164 Pursuant to 49 U.S.C. Section 13906 and 49 C.F.R. Part 387, Congress has established a strict financial responsibility floor, mandating that motor carriers engaging in the interstate transportation of passengers for compensation must maintain a minimum of $1,500,000.00 in public liability financial responsibility to secure the public, drivers, and passengers against catastrophic injury and property damage.

165 Defendant UBER systematically evades this supreme federal mandate by utilizing the diluted insurance benchmarks authorized under Florida Statute Section 627.748.

166 By decoupling its network from FMCSA oversight, Defendant UBER operates under a state-shielded framework that permits financial responsibility limits to drop as low as a $50,000/$100,000 split ceiling during log-on phases, and capped at a mere $1,000,000.00 single limit during active passenger transit.

167 This systematic statutory evasion directly inflicts a concrete, ongoing injury-in-fact upon Plaintiff in his dual capacities as an active commercial transport driver and an interstate passenger utilizing the network.

168 As a driver executing long-distance interstate corridors under the platform's non-negotiable terms, Plaintiff is stripped of the uniform federal safety net, forcing him to absorb catastrophic personal liability and asset exposure that federal law commands the motor carrier to internalize.

169 Concurrently, as a passenger traveling within the continuous streams of interstate airport-hub commerce, Plaintiff is actively deprived of the mandatory statutory financial protections enacted by Congress for the explicit benefit and safety of interstate travelers.

170 Forcing Plaintiff to travel within an unregistered network operating under a $500,000.00 insurance deficit subjects him to an immediate, ongoing risk of an under-insured catastrophic claim, rendering his exposure to this non-compliant insurance vacuum a direct, legally cognizable statutory injury.

**L. Systematic Suppression of Operational Transparency**

171 Plaintiff alleges that Defendant UBER utilizes its proprietary software infrastructure to systematically suppress operational transparency and prevent drivers from maintaining records of the platform's commercial conduct.

172 Programmatically blocking and disabling the host smartphone's native screenshot capabilities within the driver-facing application interface whenever a driver attempts to document individual trip histories constitutes a structural data extraction.

173 To preserve evidence of Defendant's conduct, Plaintiff was forced to utilize external secondary photographic equipment to physically capture digital images of his weekly driver-app trip histories and the algorithmic fare changes displayed on his device screen (see Exhibit A).

174 Plaintiff further alleges that when a driver detects payment errors or arbitrary algorithmic fare devaluations and contacts customer support, Defendant UBER routes these inquiries to a perfunctorily trained, extraterritorial support apparatus designed to obstruct resolution and systematically insulate the platform from correcting financial errors.

175 This systematic suppression of data and obstruction of dispute resolution demonstrates bad faith and establishes that Defendant UBER comes before this Court with profoundly Unclean Hands.

176 Defendant utilizes technical barriers within the driver application to prevent the gathering of evidence regarding its daily conduct as an unregistered passenger broker and motor carrier.

**M. Specific Instance of Predatory Brokerage Conduct**

177 Plaintiff factually establishes Defendant UBER's conduct as a centralized passenger broker through a real-time marketplace audit executed via Plaintiff's official consumer rider account on October 17, 2026 (see Exhibit B).

178 At exactly 11:32 PM, Plaintiff booked a prearranged commercial transit route originating at 450 NW 37th Avenue, Miami, FL 33125, terminating at Plaintiff's residence at 550 SE 6th Street, Hialeah, FL 33010, with the journey concluding at 11:44 PM.

179 For this prearranged municipal transit corridor, Defendant UBER unilaterally assessed and charged Plaintiff's consumer account a fixed, non-negotiable fare of $15.95.

180 Upon the physical conclusion of the ride at Plaintiff's home, Plaintiff immediately observed the digital dispatch interface of the executing driver, Juan, with his express permission.

181 Juan's digital application screen verified that Defendant UBER routed an algorithmic payout of only $7.33 to him for the physical carriage of the passenger (see Exhibit B).

182 This specific transaction proves that Defendant UBER instantly extracted $8.62—or 54.04%—of the gross commercial value of the transit corridor journey as a corporate brokerage fee, leaving the physical transporter with a minor fraction of the fare while forcing him to bear 100% of the equipment, fuel, and localized compliance costs (see Exhibit B).

183 This concrete, point-to-point factual data demonstrates that Defendant UBER does not operate a passive, neutral digital matching directory.

183(a). Rather, it executes the explicit conduct of an unregistered passenger broker under 49 U.S.C. Section 13102(2), unilaterally setting consumer prices, suppressing driver payouts, and hiding the transaction metrics from the participants to systematically distort the regional transportation market in open violation of 49 U.S.C. Section 13904.

184 Plaintiff further alleges that to combat massive driver attrition caused by this extreme revenue extraction, Defendant UBER dynamically deploys artificial, short-term "bonus payments" and localized "surges" to manipulate driver density and temporarily rebuild its fleet.

185 This cyclical market manipulation confirms that Defendant UBER does not operate an open marketplace, but rather exercises absolute, centralized control over the pricing, routing, and operational metrics of the regional transportation market in direct violation of 49 U.S.C. Section 13904.

**N. Sworn Corporate Admissions via SEC Filings**

186 Plaintiff factually establishes that Defendant UBER's status as a highly centralized, operational transportation provider and passenger broker is verified by the platform's own formal financial disclosures submitted to the United States Securities and Exchange Commission (SEC) (see Exhibit F).

187 Under Federal Rule of Evidence 801(d)(2), statements contained within a party's certified regulatory disclosures constitute non-hearsay Admissions by a Party-Opponent, serving as self-authenticating proof of corporate conduct.

188 In its annual Form 10-K filings, Defendant UBER explicitly describes its functional marketplace setup to investors, defining its core infrastructure as a centralized network intermediary designed to arrange, price, and clear commercial passenger transactions across its entire network (see Exhibit F).

189 Furthermore, in its recent Form 10-K and Form 10-Q disclosures under Part I, Item 1A (Risk Factors), Defendant UBER explicitly admits that its financial viability depends entirely on its unilateral capability to maintain absolute, algorithmic control over consumer-facing "Upfront Pricing" structures and supplier "Take-Rate" extractions (see Exhibit F).

190 In the same risk disclosures, Defendant UBER acknowledges that its corporate profitability requires the complete externalization of physical fleet infrastructure costs, explicitly admitting to investors that forcing the platform to absorb vehicle equipment, depreciation, maintenance, and comprehensive commercial liability insurance costs would materially disrupt its business model (see Exhibit F).

191 Under the supreme doctrine of Judicial Estoppel, a multi-billion-dollar enterprise is legally forbidden from declaring under oath to federal financial watchdogs that it operates as an integrated commercial marketplace controller to protect its stock valuation (see Exhibit F), while simultaneously claiming to a federal jurist that it functions as a passive, detached digital software bulletin board to evade national transportation laws.

**O. Actual and Constructive Knowledge of the Passenger Brokerage Omission**

192 Plaintiff alleges that Defendant UBER and the Secretary of the United States Department of Transportation hold joint, actual knowledge of the platform's non-compliant passenger brokerage model.

193 As forensically documented via the official USDOT SAFER database, the Federal Motor Carrier Safety Administration (FMCSA) actively monitors, regulates, and audits the platform's cargo logistics subsidiary, UBER FREIGHT LLC (USDOT No. 2926893) (see Exhibit C).

194 The Secretary compels this cargo branch to secure active property broker operating authority under 49 U.S.C. § 13904(a), maintain a formal minimum $75,000 broker surety bond under 49 U.S.C. § 13906, and submit to continuous safety management file audits (see Exhibit C).

195 Conversely, the plain language of 49 U.S.C. § 13904(d) commands that the Secretary "shall register" a person to be a broker for transportation of passengers if the applicant is fit, willing, and able to comply with federal standards.

196 Because the proprietary mobile application, algorithmic dispatching infrastructure, and cost-externalization methods utilized to match freight are identical to the matching networks used to arrange passenger transit, the platform and the Secretary possess comprehensive knowledge of the model's functional conduct.

197 The Secretary cannot claim he understands how this mobile application operates when it brokers property under subsection 13904(a), but is blind to its identical conduct when it brokers human lives under subsection 13904(d) and 13904(f) through international aviation gates (see Exhibit E).

**P. The Supremacy Clause Overrides State-Level Safe-Havens**

198 Plaintiff preemptively addresses and dismantles any defense by the platform or the State Defendants asserting that the emergence of state-level local safe-havens—such as the Florida

TNC Act (Fla. Stat. § 627.748)—creates a localized exception that exempts ridesharing networks from federal oversight.

199 Under the *Supremacy Clause* of the *United States Constitution* and long-standing transport jurisprudence established in ***California v. Zook***, 336 U.S. 725 (1949), the moment an enterprise integrates itself into continuous, prearranged pipelines of national and foreign commerce, local statutory accommodations are completely overridden by supreme federal law.

200 While a state retains the local police power to regulate municipal street-hails, it lacks the constitutional authority to issue an administrative safe-haven that immunizes a multi-billion-dollar passenger broker from the mandatory registration prerequisite of 49 U.S.C. § 13901(a) or the safety controls of 49 C.F.R. Part 390.

201 A state-level statutory loophole can never dilute or defeat the supreme authority of Congress to maintain a unified, non-discriminatory commercial transport index across the United States.

## V. CAUSES OF ACTION

### COUNT I: PRIVATE ENFORCEMENT OF MANDATORY PASSENGER CARRIER AND BROKER REGISTRATION PREREQUISITES

(Against Defendant Uber Technologies, Inc. and Rasier, LLC under 49 U.S.C. Section 14704(b) and Section 14707)

202 Plaintiff realleges and incorporates paragraphs 1 through 201 by reference.

203 Under a proper de novo textual construction mandated by the Supreme Court in ***Loper Bright Enterprises v. Raimondo***, 144 S. Ct. 2244 (2024), this Court owes zero deference to administrative distortions or industry labels.

204 The Court must enforce the plain, mandatory language enacted by Congress under Title 49.

205 Pursuant to 49 U.S.C. § 13901(a), Congress established an absolute statutory prohibition against unregistered operations, dictating that a person may provide transportation or service subject to federal jurisdiction "only if the person is registered under this chapter".

206 This statute makes securing federal registration a mandatory legal prerequisite before any commercial transport business can be conducted.

207 To strip the executive branch of enforcement choice over passenger brokerage, Congress enacted 49 U.S.C. § 14916(a), commanding that any person who knowingly engages in passenger broker services without holding active registration under 49 U.S.C. § 13904(d) "shall be liable to the United States for a civil penalty of not less than $10,000 for each violation".

208 Despite these interlocking statutory mandates, Defendant UBER has willfully operated a massive passenger carriage and brokerage network within the channels of national commerce for over a decade with absolute zero active passenger broker registration, in open violation of Section 13901(a), a fact pattern verified by the platform's own public financial disclosures (see Exhibit F).

209 Pursuant to 49 U.S.C. § 14704(b), a carrier or broker providing transportation or service subject to federal jurisdiction is directly liable for any economic damages sustained by a person as a result of a violation of the Act.

210 Plaintiff has suffered concrete, non-speculative sustained damages, direct economic injury, and competitive exclusion in his dual capacities as a licensed operator under Section 31-613 of the Miami-Dade County Code and as an active passenger utilizing the network.

211 In his capacity as an independent operator, Defendant UBER uses its dominant platform power to suppress driver compensation down to a flat baseline of $0.61 per mile by bypassing federal registration overhead, the mandatory safety controls of 49 C.F.R. Part 390, and the uniform financial responsibility minimums of 49 C.F.R. Part 387, a mechanism driven by the platform's self-admitted strategy to externalize all infrastructure costs (see Exhibit F).

212 When contrasted against the constant $0.725 per mile IRS business mileage cost floor, this market distortion forces a direct operational deficit of -$0.115 per mile upon Plaintiff's vehicle asset (see Exhibit A).

213 The fixed and variable overhead of the car entirely consumes the gross payout, rendering 55 hours of active physical labor completely uncompensated (see Exhibit A).

214 In his capacity as an active passenger within the network, Defendant UBER's ongoing violation of Section 13901(a) strips Plaintiff of the uniform $1,500,000.00 federal financial responsibility safety net commanded by Congress under 49 U.S.C. § 13906 and 49 C.F.R. Part 387.

215 By substituting this supreme safety floor with a diluted $1,000,000.00 state-level ceiling, Defendant UBER forces Plaintiff to absorb an ongoing, irreparable risk of an under-insured catastrophic claim while traveling within the channels of interstate commerce.

216 Plaintiff's sustained financial and protective injuries are non-speculative, traceable directly to Defendant UBER's unauthorized operations—which are openly acknowledged as a structural business design in their regulatory disclosures (see Exhibit F)— and are completely redressable by a permanent injunction under Section 14707 and a civil judgment for damages under Section 14704(b).

**COUNT II: COMPELLED EXECUTION OF MANDATORY PASSENGER BROKER REGISTRATION INFRASTRUCTURE**

(Against Defendant Secretary of the United States Department of Transportation Under the Administrative Procedure Act, 5 U.S.C. § 706(1) and the Mandamus Act, 28 U.S.C. § 1361)

217 Plaintiff realleges and incorporates paragraphs 1 through 201 by reference.

218 Under the Administrative Procedure Act, 5 U.S.C. § 706(1), reviewing courts hold an absolute command to "compel agency action unlawfully withheld or unreasonably delayed".

219 Following the Supreme Court's landmark ruling in ***Loper Bright Enterprises v. Raimondo*** (2024), this Court owes zero deference to an agency's policy-driven choices to expand or contract its own enforcement boundaries.

220 The Court must exercise its independent judgment to enforce the plain text of Title 49.

221 Defendant Secretary attempts to evade judicial review by claiming absolute prosecutorial discretion under *Heckler v. Chaney*, 470 U.S. 821 (1985).

222 However, a forensic audit of the FMCSA's Enforcement Management Information System (EMIS) database reveals a completely arbitrary, bifurcated enforcement policy driven by regulatory capture rather than law.

223 An empirical evaluation of the official SAFER database and the Licensing and Insurance (L&I) public registry exposes a total structural collapse of federal oversight.

224 While the SAFER system tracks over 339,707 active property carriers and 25,074 cargo brokers, the active registration count for passenger brokers nationwide stands at absolute zero.

225 The Secretary has completely omitted any mechanism to process passenger broker registrations under 49 U.S.C. § 13904(d) within the Unified Registration System (URS) portal.

226 The discretionary phrasing of 49 U.S.C. § 13904(f)—which states the Secretary "may" choose which specific bond or insurance instruments to impose on passenger brokers—grants choice only over the type of financial security framework.

227 It does not erase the mandatory requirement to secure registration before operating under 49 U.S.C. § 13901(a), nor does it grant the Secretary a right to waive the mandatory $10,000 civil penalty commanded under 49 U.S.C. § 14916(a) against entities operating without that registration.

228 This total administrative failure has created an unpoliced sanctuary.

229 As proven by the SAFER database, the Secretary actively regulates, monitors, and enforces strict Title 49 compliance against the platform's property-hauling branch, UBER FREIGHT LLC (USDOT No. 2926893), forcing compliance with Chapter 139 broker registration under subsection (a) and minimum $75,000.00 surety bonds (see Exhibit C).

230 Yet, the Secretary completely withholds the creation of an administrative registration path to execute passenger broker registrations under subsection 13904(d) when the platform brokers human passengers through international airport hubs.

231 This disparate treatment is driven by adaptive market bias and administrative capture.

232 Because the freight sector is occupied by multi-billion-dollar corporate competitors with the immediate capital to drag the platform into federal court under 49 C.F.R. § 371.3 to protect their market equity, the platform is forced into compliance.

233 Conversely, because the passenger transport sector has been stripped of independent corporate giants to act as a check, the Secretary has completely withheld his statutory oversight duties.

234 This arbitrary segregation—enforcing mandatory "shall require" and "shall register" mandates when a platform handles cargo under subsection 13904(a), while completely abandoning those exact same public safety protections when the platform handles human lives under subsection 13904(d)—constitutes agency action unlawfully withheld under 5 U.S.C. § 706(1).

235 The Secretary's multi-decade omission is the direct cause of Plaintiff's irreparable economic and protective injuries, forcing an ongoing out-of-pocket operating deficit of -$0.115 per mile that destroys his private property equity and strips away his $1,500,000.00 federal financial responsibility safety net (see Exhibit A).

236 This leaves Plaintiff exposed to catastrophic under-insured liabilities and renders hours of active commercial labor entirely uncompensated.

**COUNT III: DEPRIVATION OF FEDERAL RIGHTS UNDER 42 U.S.C. SECTION 1983 — EXPRESS AND OBSTACLE PREEMPTION VIA THE SUPREMACY CLAUSE**

(Against Defendants Attorney General James Uthmeier and Dave Kerner in their Official Capacities)

237 Plaintiff realleges and incorporates paragraphs 1 through 201 by reference.

238 Plaintiff brings this Cause of Action pursuant to 42 U.S.C. Section 1983 to remedy the ongoing deprivation, under color of state law, of absolute statutory rights secured to him by the federal transportation laws and Constitution of the United States.

239 The alternative regulatory framework established by Florida Statute Section 627.748 actively deprives Plaintiff of federal statutory rights secured by Title 49, specifically his right to enter, compete, and operate within a federally normalized interstate market free from unconstitutional, state-enforced regulatory safe-havens that favor non-compliant entities.

240 Plaintiff remedies these ongoing deprivations under color of state law under the supreme federal doctrine established by the United States Supreme Court in ***Ex parte Young***, 209 U.S. 123 (1908), which explicitly empowers a private litigant to bring suit in federal court against individual state officials in their official capacities to permanently enjoin the enforcement of an unconstitutional or preempted state statute.

241 As the chief legal officer of the State of Florida, Defendant UTHMEIER possesses the inherent common-law power and statutory authority to enforce, validate, and defend the legislative boundaries of the state, rendering him a proper party under ***Ex parte Young***.

242 Defendant DAVE KERNER, in his official capacity as Executive Director of the Florida Department of Highway Safety and Motor Vehicles (FLHSMV), holds a concurrent, field-level operational duty to administer motor vehicle registration and police highway safety across Florida.

243 The legislative architecture of Florida Statute Section 627.748 relies on a deceptive framework of structural immunity, operating as a self-enforcing statute that purposefully omits any independent State administrative or regulatory enforcement entity.

244 Under the plain terms of this statutory artifice, Defendant UBER is permitted to self-certify its own corporate compliance regarding driver screening, background checks, and vehicle maintenance, and insurance compliance completely bypassing public oversight.

245 While the statute provides zero independent state oversight mechanisms, it acts as a powerful defensive shield that actively prohibits local municipal authorities and highway patrol officers from executing standard vehicle inspections.

246 By executing and recognizing this legislative safe-haven, Defendant KERNER actively commands state enforcement personnel to treat these personal, uncommercially plated rideshare vehicles as a protected class immune from traditional commercial vehicle enforcement.

247 This administrative policy directly stops local police from enforcing mandatory commercial plating rules and supreme federal commercial insurance requirements against Defendant UBER's unpermitted, federally unlawful network.

248 In stark contrast, fully credentialed taxicabs, executive livery services, and independent commercial operators remain subject to strict, hands-on State administrative enforcement, roadway penalties, and severe financial oversight.

249 This discriminatory framework creates an unconstitutional double standard where the State uses its police powers to aggressively enforce compliance costs against legitimate operators, while simultaneously using its executive machinery to protect an unregistered, federally unlawful network from any meaningful compliance whatsoever.

**COUNT IV: VIOLATION OF THE DORMANT COMMERCE CLAUSE**

(Against Defendant Attorney General James Uthmeier and Dave Kerner under 42 U.S.C. Section 1983)

250 Plaintiff realleges and incorporates paragraphs 1 through 201 by reference.

251 Under the controlling constitutional standard established by the United States Supreme Court in ***Pike v. Bruce Church, Inc***., 397 U.S. 137, 142 (1970), a state statute violates the

Dormant Commerce Clause if the structural burdens it imposes on interstate commerce are clearly excessive in relation to the putative local benefits.

252 Under the *Pike* balancing test, any purported local health or safety benefits of this self-enforcing framework are entirely illusory because the statute deliberately strips away public regulatory oversight and permits an unverified corporate platform to self-certify its own safety compliance.

253 Conversely, the structural burdens and direct damages this state-shielded framework inflicts on the national stream of commerce are absolute and severe, because it fractures national regulatory uniformity, completely deprives interstate travelers of mandatory federal $1,500,000.00 public liability protections; passengers and drivers of required federal broker surety bond protections and forces compliant, federally registered operators to absorb a catastrophic competitive disadvantage that algorithmically drives legitimate transportation services out of the interstate marketplace.

**COUNT V: VOIDANCE OF UNLAWFUL AIRPORT ACCESS FEES**
(Against Defendant Miami-Dade County)

254 Plaintiff realleges and incorporates paragraphs 1 through 201 by reference.

255 Defendant MIAMI-DADE COUNTY's mandatory per-trip fee structures and forced contract frameworks at Miami International Airport directly penalize operators licensed under Section 31-613 of the Miami-Dade County Code.

256 These local policies violate the express commands of 49 U.S.C. Section 14501(d)(1) by levying an unauthorized local tax and fee on account of the fact that a permitted motor vehicle is providing prearranged ground transportation.

257 Because Plaintiff is a credentialed livery provider directly subjected to these mandatory assessments while executing unbroken streams of interstate airport commerce, Plaintiff has suffered a direct financial injury that is completely redressable by a judicial declaration voiding the County's unlawful fee framework.

258 Because these local rules regulate the pricing, routing, and access parameters of prearranged interstate carriers, and do not constitute "voluntary contracts for preferential terminal door access" permitted under Section 14501(d)(3)(B), they are preempted, unconstitutional, and must be declared void.

**COUNT VI: DECLARATORY JUDGMENT ON FAA TRANSPORTATION WORKER EXEMPTION**

(Against Defendants Uber Technologies, Inc. and Rasier, LLC)

259 Plaintiff realleges and incorporates paragraphs 1 through 201 by reference.

260 Plaintiff invokes direct judicial relief under the Federal Arbitration Act.

261 Plaintiff brings this Cause of Action seeking a binding judicial declaration that his operational transport agreements with Defendants UBER and RASIER are explicitly exempt from forced private arbitration under Section 1 of the Federal Arbitration Act (FAA), 9 U.S.C. Section 1.

262 Contracts of employment for interstate transportation workers are textually excluded.

263 Under the plain language of 9 U.S.C. Section 1, contracts of employment of "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" are categorically excluded from the coverage and enforcement mandates of the FAA.

264 The threshold question of the Section 1 exemption belongs exclusively to the judiciary.

265 As established by the United States Supreme Court in ***New Prime Inc. v. Oliveira***, 586 U.S. 105, 116 (2019), the applicability of the Section 1 statutory exemption is an antecedent, gateway question that must be determined de novo by the federal judiciary before a court can order arbitration.

266 The statutory exemption encompasses independent contractor agreements.

267 The Supreme Court in ***New Prime Inc***. explicitly ruled that the 1925 statutory phrase "contracts of employment" encompasses independent contractor operating agreements, completely destroying any corporate defense based on worker misclassification.

268 The High Court has rejected restrictive and localized industry tests.

269 United States Supreme Court has systematically rejected narrow lower-court limitations through its trilogy of modern, controlling frameworks: ***Southwest Airlines Co. v. Saxon***, 596 U.S. 450 (2022); ***Bissonnette v. LePage Bakeries Park St., LLC***, 601 U.S. 246 (2024); and ***Flowers Foods, Inc. v. Brock***, No. 24-935 (May 28, 2026).

270 The modern federal standard focuses strictly on the worker's frequent duties.

271 Under the supreme standard articulated in ***Southwest Airlines Co. v. Saxon***, 596 U.S. 450, 459 (2022), a worker belongs to an exempt "class of workers" under Section 1 based strictly on what the worker frequently does for the company, not what the company does generally as an industry.

272 Workers do not need to work in a formal transportation industry.

273 Under the supreme standard established in ***Bissonnette v. LePage Bakeries Park St., LLC,*** 601 U.S. 246, 256 (2024), the High Court explicitly ruled that a transportation worker need not

work for a company specifically operating within the transportation industry to fall within the Section 1 exemption, so long as their work plays a direct and necessary role in the free flow of commerce.

274 Intrastate transportation legs do not defeat the federal exemption.

275 Under the supreme standard established in ***Flowers Foods, Inc. v. Brock***, No. 24-935 (May 28, 2026), the High Court unanimously rejected any bright-line rule requiring workers to cross state lines or touch vehicles that do, holding that a worker who transports passengers or goods on a purely intrastate leg of a broader interstate journey qualifies for the Section 1 exemption.

276 The uniform test is direct involvement in an unbroken interstate journey.

277 Taken together, the ***Saxon-Bissonnette-Brock*** trilogy establishes that the relevant inquiry under Section 1 is whether the distinct class of workers plays a direct, active, and necessary part in completing an unbroken leg of a continuous interstate or foreign journey.

278 Plaintiff belongs to a distinct class of professional airport-hub transport operators.

279 Plaintiff belongs to a highly specialized class of professional transportation workers: credentialed commercial livery, black car, and executive airport-hub transport operators whose daily labor parameters establish an indispensable nexus to national and foreign commerce.

280 Plaintiff's regional transit parameters transcend standard municipal limits.

281 As supported by contemporaneous digital trip documentation, Plaintiff's labor frequently consists of executing prearranged regional, cross-county long-distance transits spanning 110 miles from Miami to Naples and exceeding 270 miles to Tampa (see Exhibit A).

282 Plaintiff captures out-of-state travelers within an unbroken stream of commerce.

283 Plaintiff's business records verify that he routinely executes prearranged airport-hub dispatches capturing out-of-state and international travelers arriving at Miami International Airport (MIA) and physically transferring them along an intrastate leg to international cruise terminals at PortMiami.

284 The fixed and persisting intent of the travelers establishes federal jurisdiction.

285 Because the underlying travelers' fixed and persisting intent was an unbroken leg of a national or foreign journey, the ground transportation leg constitutes an inseparable, active corridor of interstate commerce under federal law.

286 Plaintiff performs a direct and necessary role in the free flow of commerce.

287 Because Plaintiff plays an indispensable, direct, and necessary role in the free flow of these international and interstate passengers across regional boundaries, his operating agreements constitute contracts of a class of transportation workers engaged in interstate commerce under the ***Saxon-Bissonnette-Brock*** doctrine.

288 Adhesive private arbitration clauses forced on transportation workers engaged in initiating or completing interstate commerce are under Supreme authorities void ab initio under Section 1.

289 Consequently, Plaintiff is explicitly exempt from forced private arbitration under 9 U.S.C. Section 1, rendering the adhesive arbitration delegation contracts void ab initio and unenforceable.

290 State-level statutory loopholes cannot defeat supreme federal access rights.

291 Diluted state-level classifications under the Florida TNC Act cannot be utilized by Defendants to defeat this supreme federal statutory right of direct access to the federal judiciary.

## PRAYER FOR RELIEF

***WHEREFORE***, Plaintiff Shawn Mendel respectfully requests that this Court enter judgment in his favor and grant the following relief:

A. Declaring Florida Statutes Section 627.748 unconstitutional, preempted, and void under the Supremacy Clause and the Dormant Commerce Clause, and permanently enjoining Defendants JAMES UTHMEIER and DAVE KERNER from enforcing or administering its provisions;

B. Issuing a Permanent Injunction under 49 U.S.C. Section 14707 enjoining Defendants UBER TECHNOLOGIES, INC. and RASIER, LLC from operating their commercial prearranged passenger network unless and until they secure both formal motor carrier operating authority and broker operating authority from the FMCSA, and comply fully with the mandatory financial responsibility frameworks of 49 U.S.C. 13904(f) and 49 C.F.R. Part 387 and safety management frameworks of 49 C.F.R. Part 390;

C. Issuing a Writ of Mandamus pursuant to 28 U.S.C. § 1361 commanding the Secretary of Transportation to perform his mandatory ministerial duty by immediately establishing and enforcing an active passenger broker registration index, "to turn on the switch to active," under 49 U.S.C. § 13904(d) and 49U.S.C. 13904(f) for all digital intermediaries matching passenger transits within national commerce;

D. Declaring all local per-trip TNC fee structures, mandatory surcharges, and forced terminal contracts at Miami International Airport enforced by Defendant MIAMI-DADE COUNTY void under the express preemption commands of 49 U.S.C. Section 14501(d)(1);

E. Declaring that Plaintiff Shawn Mendel belongs to an exempt class of professional transportation workers under Section 1 of the Federal Arbitration Act (9 U.S.C. Section 1) under the Supreme Court's controlling ***SAXON-BISSONNETTE-BROCK*** framework, rendering the adhesive private arbitration agreements void ab initio and unenforceable;

F. Awarding Plaintiff the costs of this action, giving formal Notice of Constitutional Question pursuant to Federal Rule of Civil Procedure 5.1 to the Attorney General of the United States and the Attorney General of Florida, and granting any further relief this Court deems just and proper.

Dated: October 31, 2026

Respectfully submitted,

By: ______________________
SHAWN MENDEL, Plaintiff Pro Se

550 SE 6th Street
Hialeah, FL 33010
Ph. 305-360-6216
Email: Carpartners1@gmail.com

**VERIFICATION**

**STATE OF FLORIDA**
**COUNTY OF MIAMI-DADE**

I, Shawn Mendel, declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 and the laws of the United States of America, that I am the Plaintiff Pro Se in the above-captioned matter; that I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief and know the contents thereof; and that the factual allegations, operational data, and trip descriptions contained therein are true, accurate, and correct based upon my own personal knowledge, business records, and contemporaneous digital trip documentation.

Executed on this 31st day of October, 2026, at Hialeah, Florida.

SHAWN MENDEL, Plaintiff Pro Se
550 SE 6th Street
Hialeah, FL 33010
Ph. 305-360-6216
Email: Carpartners1@gmail.com

**COMPLAINT CERTIFICATE OF SERVICE**
**(MANDATED BY 49 U.S.C. SECTION 14707(b))**

I HEREBY CERTIFY that a true and correct copy of the foregoing Verified Complaint, along with all accompanying exhibits, was formally served upon the Secretary of the United States Department of Transportation by depositing the same in the United States Mail via Certified Mail, Return Receipt Requested, on this 31st day of October, 2026, addressed as follows:

Hon. Secretary of Transportation
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

Plaintiff further certifies that in accordance with the statutory enforcement mechanisms of Title 49, a courtesy copy of this Verified Complaint has simultaneously been dispatched via Certified Mail to the:

Attorney General of the United States
Department of Justice,
950 Pennsylvania Avenue, NW,
Washington, DC 20530.

Dated: October 31, 2026

By: ______________________________
SHAWN MENDEL, Plaintiff Pro Se

550 SE 6th Street
Hialeah, FL 33010
Ph. 305-360-6216
Email: Carpartners1@gmail.com